THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THOMAS R. SCHWARTZ, Defendant-Appellant.

Second District No. 2—89—1178

Opinion filed December 16, 1991.

INGLIS, J., dissenting.

G. Joseph Weller and Manuel S. Serritos, both of State Appellate Defender's Office, of Elgin, and Michael J. Pelletier and Barbara Kamm, both of State Appellate Defender's Office, of Chicago, for appellant.

Roland W. Burris, Attorney General, of Springfield, and James E. Ryan, State's Attorney, of Wheaton (Joseph L. Ponsetto and Timothy C. Reynolds, Assistant Attorneys General, of Chicago, and William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WOODWARD delivered the opinion of the court:

Following a bench trial, the defendant, Thomas Schwartz, was found guilty of two counts of aggravated home repair fraud (Ill. Rev. Stat. 1987, ch. 121½, pars. 1603, 1605). Defendant was sentenced to serve 30 days in the county jail and 11 months' work release. He was fined $1,500 in each case and ordered to make restitution to the victims. Finally, defendant was prohibited from working in the home repair business. Defendant appeals.

FOR THE STATE

Roy Jozaitis, 70 years of age, testified that in mid-October 1987 he talked with the defendant about purchasing new windows for his home. On November 2, 1987, he went to defendant's place of business and entered into a contract for the installation of a bay window for $1,760. According to Jozaitis, defendant requested a down payment of approximately one-half of the contract price. Defendant informed Jozaitis that it would take 12 weeks for the windows to be ordered and installed. Jozaitis informed defendant that he wanted the windows installed by Christmas. Defendant assured Jozaitis that the windows would probably be done by Christmas but that he did not wish to put that in writing to protect himself in case of delays. Jozaitis identified the check he wrote to defendant for the initial payment and stated that the check had been cashed on November 3, 1987.

Jozaitis further testified that he returned to defendant's place of business on November 7, 1987, because his wife wanted written assurance that the windows would be installed by Christmas. As Jozaitis entered the store, he observed a couple of people leaving the store. They appeared to be very upset with the defendant. Defendant explained to Jozaitis that the people were upset because he had not delivered their windows on time. Although the windows were on the truck, they had refused delivery because delivery had been promised for the morning, and it was already afternoon, and the people did not want to wait that long. According to Jozaitis, defendant then amended his contract to provide delivery of Jozaitis's windows by Christmas.

Jozaitis further testified that in December 1987 he read an article in the Elmhurst Press that defendant was being charged in connection with complaints filed with the State's Attorney. He attempted to contact the defendant but could not reach him. Defendant did not install any windows in his home, nor did he refund Jozaitis's money.

On cross-examination, Jozaitis testified that in December 1987 he received a letter from the State's Attorney's office that a receiver had been appointed for the defendant's business. He was also contacted by Advantec, the company that had been appointed to fulfill the defendant's contracts. He ignored Advantec.

Rocco DiLallo, 70 years of age, testified that in November 1987 he contacted the defendant to install a bay window in DiLallo's home. Defendant came to his house and discussed the project with DiLallo. Defendant wrote up a contract which DiLallo did not sign at that time. DiLallo contacted other installers but found that their prices were a little higher than defendant's. On November 10, 1987, defendant came

over to DiLallo's house, and DiLallo signed the contract for the installation of a bay window at a cost of $1,830. At defendant's request, DiLallo gave him a check for $830. According to DiLallo, defendant told him it would take four to five weeks for the installation. Defendant also told DiLallo that he was insured but not bonded.

DiLallo further testified that the contract was modified to include triple glass. He called defendant's office once or twice and was told by a girl working there that his window had been ordered. After he read the article in the Elmhurst Press concerning the allegations against the defendant, he contacted a senior citizen's office in Elmhurst. He was told to contact the Attorney General's office. Defendant never installed the bay window, and DiLallo never received a refund from the defendant.

On cross-examination, DiLallo denied that defendant told him that the order for the bay window had been placed with Advantec but stated a girl in defendant's office told him defendant had placed the order. Advantec did contact him but did not install his window. Advantec did not tell him that his order had been placed with Advantec by the defendant.

FOR THE DEFENSE

Sam Savides testified that, for four years and up to 1989, he was the office administrator for Thermal Industries. His duties included taking orders from window and door installers. Late in 1984, defendant's company, TRS Installations, began placing orders with Thermal Industries. In 1985, defendant placed $100,000 worth of orders, and Savides recalled no defaults in payment or late payments in 1985. In both 1986 and 1987, defendant placed approximately $175,000 in orders.

Savides further testified that in 1986 at different times there were defaults in payments by the defendant. The total amount in default was between $5,000 and $20,000, but defendant subsequently made up the defaults. At the end of 1987, defendant owed between $20,000 and $25,000 on the $175,000 in orders he had placed in 1987.

Savides further testified that 99% of defendant's orders were for residential installations. Orders would be called in to Savides by defendant or his installers or salesmen. Copies of the orders were then sent to Pittsburg, where Thermal Industries had the doors and windows manufactured.

Savides further testified that, as early as 1985, defendant was put on a COD basis with Thermal Industries, but this was not unusual. According to Savides, in 1987, there were five to seven orders that defendant failed to pick up. At the end of 1987, Savides was aware that

defendant was being sued by the Attorney General's office and was enjoined from further business proceedings.

On cross-examination, Savides testified that in 1987 the name of defendant's company was changed from TRS Installations to Du Page Window and Lumber Company. Savides also dealt with a company called M.S. Windows with which defendant was also affiliated. Defendant did not change the address of his business. The "bad checks" received from defendant were defendant's checks, not those of his customers. On occasion, defendant would explain a "bad check" by stating that he had had a problem with a customer's check.

Savides further testified that, from 1984 through 1986, he considered defendant to be an average businessman who placed a substantial number of orders but who had quite a few customers who were upset for one reason or another. By July 1987, defendant's payments were not forthcoming. Savides continued to take orders from defendant until the fall of 1987. Some of defendant's customers called Savides directly for information as to where their windows were. He would direct them to call defendant directly. Savides had no communication problem with defendant in 1987.

On redirect examination, Savides testified that there were some problems with defendant's checks in the spring of 1987. Those checks were made up by the summer of 1987. According to Savides, the window installation business is seasonal with fall being the best in terms of placement of orders.

On re-cross-examination, Savides testified that as of February 3, 1988, defendant was behind with a total average of $20,964.73.

Dennis Jackson, Sr., president of Vinyl-1, testified that he first met defendant in approximately July 1987 and that defendant became a customer of Vinyl-1. He ceased doing business with defendant in November 1987. Between July 1987 and November 1987, defendant or his employees placed between $8,000 and $10,000 in orders with Vinyl-1.

Jackson further testified that from July to November 1987 defendant was on a credit basis with Vinyl-1. According to the business records of Vinyl-1, of the $8,000 to $10,000 of the orders placed by defendant, $1,884.82 is in arrears. Approximately 10 orders placed by defendant were not completed by Vinyl-1 because the Attorney General's office instructed Jackson not to contact defendant's customers.

On cross-examination, Jackson testified that defendant was placed on a COD basis because he did not pay his bills, but he did not remember when defendant was placed on a COD basis. Jackson only dealt with defendant's company, Du Page Window and Lumber.

Allen McCreary, marketing director for Vinyl-1, testified that, as part of his duties in 1987, he was instructed to determine the amount of orders placed by the defendant it was currently processing and that a decision would then be made as to whether to continue to do business with defendant. McCreary reviewed the contracts of approximately 40 customers early in November 1987. At that time, none of the contracts were in default. The value of the contracts, including the windows and installation costs, was between $70,000 and $80,000. According to McCreary, although Vinyl-1 attempted to complete the contracts, it was prevented from doing so because the then president of Vinyl-1, Eric Feldt, ordered work stopped on defendant's orders after he received a call from the Attorney General's office. It was after that Vinyl-1 terminated business with the defendant.

On cross-examination, McCreary testified that many of Vinyl-1's contractors did not pay until the windows were installed. Not all of the windows of the $70,000 to $80,000 worth of orders were ever made. Only about $3,000 to $4,000 was owed to Vinyl-1.

Jay Deems testified that he is employed by Thermal Industries and was so employed in the Chicago area office in 1987. In preparation for his testimony, Deems was asked to review the records of Thermal Industries in connection with its dealings with the defendant.

Deems testified that in 1984 and 1985 Thermal Industries did business with the defendant as TRS Installations. The records from 1985 show that defendant picked up $50,000 worth of invoiced orders. The records for 1986 show that defendant picked up $175,000 worth of invoiced orders. According to the record, defendant was not in arrears to Thermal Industries at the end of 1986. The records for 1987 show that the defendant picked up $184,000 worth of invoiced orders.

Deems further testified that in February 1987 there were difficulties in collecting payment from the defendant, which got progressively worse. Defendant did make payments to Thermal Industries in 1987, but Deems did not have the exact amounts. He did have the amount that defendant was in debt at the end of 1987 which was approximately $12,000, which meant defendant had paid somewhere in the amount of $172,000 to Thermal Industries during 1987.

Deems further testified that around October or November 1987 Thermal Industries began to refuse orders from the defendant because he was not picking up previous orders.

Deems further testified that at the beginning of 1987 defendant was placed on a COD basis with Thermal Industries. Around October or November 1987, Thermal Industries began to refuse orders from the defendant because he was not picking up previous orders. There was no

record of either the Jozaitis or DiLallo order being placed with Thermal Industries.

Defendant testified that he had a high school education and during the 1970's he drove a truck for a living. Late in the 1970's, he worked for people in Villa Park who operated a window replacement business. He then went to work for a home improvement company in Downers Grove. He then returned to driving trucks. In 1984, he purchased the Villa Park store and started up TRS Installation. His primary supplier of doors and windows was Thermal Industries. He did not have a bookkeeper; either he or his secretary did the bookkeeping. Defendant never had been employed as a bookkeeper.

Defendant further testified that in 1985 TRS Installation placed between $225,000 and $250,000 worth of orders and in 1986 between $275,000 and $280,000 worth of orders. In 1987, defendant changed the name of his company to Du Page Window & Lumber Company because one company would not do business with him as an installation company unless he had a lumber company, and in some cases, he received a larger discount because of being a lumber company rather than an installation company.

Defendant further testified that he had three salesmen off and on during 1987 on a commission-only basis. He wrote the contracts himself, and whoever took the order signed the contract. He had several installers during 1987.

Defendant further testified the residential door and window business was a seasonal business, and he would do 50% of his business between September and December. From 1984 until late in 1986, his business was doing well. Late in 1986, he ran into cash flow problems which he eventually made up with his suppliers. In 1987, the cash flow problem reoccurred. Between March and November 1987, defendant refunded $10,000 to customers. In 1987 he had almost 200 customers. By the middle of October 1987, he had written approximately $290,000 worth of orders. He was unable to fulfill all of the contracts; everything that was coming in went to pay bills, and some $20,000 in bills were paid in the first part of October 1987. According to defendant, the stock market crash in the fall of 1987 also affected business. In November 1986, he did $85,000 in orders; however, in November 1987, he only did $4,000.

Defendant further testified that upon the taking of an order, he would take a 50% or less down payment from the customer. Although his credit status changed back and forth, by 1987, he was on a COD basis with all suppliers. By fall 1987, cash had stopped coming in, and he could not get installers who would do the work. According to defendant, he would leave enough of the contract amount unpaid which came close

to the cost of fulfilling the contract and would take enough to cover operating expenses. Defendant admitted that he was writing more orders than he could fulfill in 1987 because he had run out of cash. He did recall placing the Jozaitis order with either Bradford or Advantec. Defendant did not dispute the fact that he defaulted on the contracts to various individuals who testified.

Defendant further testified that in fall 1987 he was sued civilly by the Attorney General and Du Page Window and Lumber went into receivership. Two weeks after he entered into a consent agreement with the Attorney General's office, he was charged in the present case. Under the consent agreement, he was to make restitution.

On cross-examination, defendant testified that he was beginning to dig himself out of his financial problems by September and October 1987 but suffered a setback after the stock market crash in the fall of 1987. According to the defendant, all of the checks or cash he received from customers went to pay bills. Defendant admitted not returning all of the telephone calls to dissatisfied clients, but he did return a lot of them. He denied telling anyone he was bonded.

On redirect examination, defendant testified that in spring 1987 his checking account at West Suburban Bank was closed because of overdrafts. He was paying bills in cash. Defendant ended 1987 with approximately $187,000 in orders placed and $12,000 in defaulted payments.

Following argument, the trial court found the defendant guilty of the Jozaitis and DiLallo charges, stating as follows:

"There is going to be a guilty finding with respect to Jozaitis and DiLallo because based upon all the evidence that I heard, I think as of November, the evidence that I heard, I think as of November the evidence is that there was no way that the defendant was doing anything with respect to trying to get all of that business. He had been cut off from suppliers and I think at that time, at the time that those contracts were entered into, there was an intent not to complete those contracts in violation of the law."

The defendant was sentenced as stated above, and this appeal followed.

Although the defendant has raised issues in regard to the constitutionality of the penalty portion of the Act, as well as the sentence he received, we need only address the first issue raised by defendant in order to resolve this case, namely, that defendant contends that he was not found guilty of aggravated home repair fraud beyond a reasonable doubt. A person commits aggravated home repair fraud *when he knowingly enters into an agreement or contract, written or oral, with a person, 60 years of age or older, for home repair, and he knowingly misrepresents a material fact relating to the terms of the contract* or

agreement or the preexisting or existing conditions of any portion of the property involved, or creates or confirms another's impression which is false and *which he does not believe to be true or promises performance which he does not intend to perform or knows will not be performed.* Ill. Rev. Stat. 1987, ch. 121½, pars. 1603, 1605.

It is well established that the failure to fulfill a contract or to refund or repay money given a defendant does not alone establish that the defendant intended or knew he would not perform a contract. (*People v. Jensen* (1982), 103 Ill. App. 3d 451, 453.) Whether the specific intent to defraud exists is a question of fact that does not have to be proved by direct evidence. Direct evidence of this intent is rarely available, so circumstantial evidence may be sufficient to sustain a conviction. (*People v. Rolston* (1983), 113 Ill. App. 3d 727, 731.) Questions of fact and inferences to be drawn from the evidence are for determination by the trier of fact. Although the determinations of the trier of fact are entitled to great weight, a reviewing court still has an obligation to set aside a conviction when the evidence is so unsatisfactory that it raises a reasonable doubt of the defendant's guilt. *Rolston*, 113 Ill. App. 3d at 731.

We note that defendant was indicted and tried on five counts of aggravated home repair fraud and one count of home repair fraud (because the victim was *under* 60 years old). The trial court found the defendant not guilty of all but the Jozaitis and DiLallo counts even though the defendant's conduct in all of the counts was virtually identical. The sole distinction as pointed out by the trial court in its decision was the timing of the acceptance by the defendant of the orders. According to the trial court, the evidence showed that defendant could not have ordered windows because his suppliers were no longer willing to do business with him. Thus, the trial court concluded, at the time defendant accepted money from Jozaitis and DiLallo, he did not intend to fulfill the window replacement contract.

Raymond Jozaitis signed his contract with defendant on November 2, 1987, and Rocco DiLallo signed his contract with the defendant on November 10, 1987. Sam Savides, office administrator for Thermal Industries, one of defendant's suppliers, testified that in the fall of 1987 Thermal Industries stopped taking orders from the defendant. However, Savides did not testify to an exact date or even when in the fall ordering stopped. Dennis Jackson, Sr., testified that Vinyl-1, another of defendant's suppliers, testified that it was approximately November 1987 that Vinyl-1 stopped taking orders for the defendant. Jackson also testified that Vinyl-1's relationship with the defendant was terminated by the beginning of December 1987. Allen McCreary testified that Vinyl-1's decision to terminate business with defendant came as a result of a call from

the Attorney General's office. Although there is no testimony as to the exact date of their telephone call, the civil suit against defendant was not filed until December 1987.

We disagree with the trial court's conclusion that the evidence showed that the defendant never intended to fulfill the contracts at the time he entered into them. The evidence is extremely sketchy as to when defendant's suppliers ceased doing business with him. Given that both the Jozaitis and DiLallo contracts were entered into within the first 10 days of November, there is no direct evidence that the suppliers had ceased doing business with defendant as of November 10, 1987. Although Savides testified that it was in the fall that Thermal Industries ceased doing business with defendant, he did not state an exact date or even the exact month when the business relationship ceased. It is apparent from the testimony of Dennis Jackson, Sr., as well as that of Allen McCreary, that Vinyl-1 did not cease doing business with defendant until sometime in November. Finally, it is apparent from the testimony of Mc-Creary that at least Vinyl-1 would have continued to supply defendant with windows had not the Attorney General's office intervened.

Thus, the evidence does not show beyond a reasonable doubt that as of November 10, 1987, defendant was cut off from his suppliers as the trial court had concluded. Since that was the basis for the trial court's decision to find the defendant guilty of aggravated home repair fraud on the Jozaitis and DiLallo contracts, the defendant's conviction on those counts must be reversed.

The judgment of the circuit court is reversed.

Reversed.

GEIGER, J., concurs.

JUSTICE INGLIS, dissenting:

I dissent from the opinion of the majority. The majority concludes that defendant's conduct in all six counts was virtually identical without giving appropriate consideration to the timing differences. The timing of defendant's acceptance of the orders and his taking of money from the elderly victims were properly weighed by the trial judge. The trial court's conclusion that, at the time he accepted money from Jozaitis and DiLallo, defendant did not intend to fulfill the window replacement orders was supported by the evidence.

As the majority correctly states, defendant's intent is measured at the time he entered into the home repair contracts. I believe that a crucial phrase in the Home Repair Fraud Act (Ill. Rev. Stat. 1987, ch.

121½, par. 1601 *et seq.*) is found in section 3(a)(1), which states that a person commits home repair fraud when he enters into such a contract and knowingly "[m]isrepresents a material fact *** which he does not believe to be true, or promises performance which he does not intend to perform or knows will not be performed." Ill. Rev. Stat. 1987, ch. 121½, par. 1603(a)(1).

Defendant had a trail of broken promises, false representations and lies stretching from March 12, 1987, when he dealt with Harold Johnson (age 76) to May 29, 1987, when he dealt with Jack White (age 62), and through September when he dealt with James Kneip (age 74) and Audrey Jensen. Defendant failed to perform, but continued to solicit orders and take money. When defendant solicited orders and took money from Raymond Jozaitis (age 70) on November 2, 1987, and Rocco DiLallo (age 70) on November 10, 1987, the record supports a conclusion beyond a reasonable doubt that defendant made these two promises of performance, yet did not intend to perform or knew that he would not be able to perform.

The innocent misrepresentations of a floundering businessman in March, May and September became criminal acts against two senior citizens in November. Defendant knew by November that he was lying to his customers. He knew in November that he had not completed several orders, yet he took money from both Jozaitis and DiLallo knowing he could not complete either order as promised. The trial judge evaluated the facts and circumstances presented and rejected the evidence and arguments now accepted by the majority.

The trial judge, as the trier of fact, was not required to accept the defendant's version of the facts. It is not necessary that the evidence presented at trial exclude every possible doubt, so long as the entire chain of circumstances leads to a reasonable and moral certainty that the accused committed the crime. *People v. Pintos* (1988), 172 Ill. App. 3d 1096, 1101, *aff'd* (1989), 133 Ill. 2d 286.

The courts of Illinois have consistently held that the function of the trier of fact in criminal prosecutions is to determine the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. (*People v. Jaffe* (1986), 145 Ill. App. 3d 840, 846.) In the present case, the trial judge resolved the credibility issue as to the defendant's testimony in favor of the State's witnesses.

The majority's conclusion that "the evidence does not show beyond a reasonable doubt that as of November 10, 1987, defendant was cut off from his suppliers" misses the point. (222 Ill. App. 3d at 1049.) Defendant's intention or knowledge that his promises could not be

performed is the issue. Defendant's continued nonperformance, repeated false promises, and lies support the trial court's decision finding defendant guilty of aggravated home repair fraud on the Jozaitis and DiLallo contracts. I therefore dissent.